# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Raymond P. Moore

Case No. 16-cv-03054-RM-STV

TRANSFIRST, LLC,

      Plaintiff,

v.

DANIEL BROWN,
DAVID GREK,
DAVID Y. REICH,
VETERAN TONER SERVICES, LLC,
BA BROKERAGE, LLC,
BRIAN APPELHANS,

      Defendants.

---

## OPINION AND ORDER

---

On July 27, 2017, plaintiff TransFirst, LLC ("plaintiff") filed a Second Amended Complaint ("SAC") against defendants Daniel Brown ("Brown"), David Grek ("Grek"), David Y. Reich ("Reich"), Veteran Toner Services, LLC ("VTS"), Brian Appelhans ("Appelhans"), and BA Brokerage, LLC ("BA") (collectively, "defendants"), raising the following claims: (1) breach of contract; (2) restitution; (3) fraud/deceit; (4) aiding and abetting fraud/deceit; (5) civil theft; (6) aiding and abetting civil theft; (7) violation of the Colorado Organized Crime Control Act, Colo. Rev. Stat. § 18-17-101 *et seq*.; and (8) civil conspiracy. (ECF No. 102.)

On August 14, 2017, defendant Reich filed a Motion to Dismiss Second Amended Complaint for Lack of Personal Jurisdiction ("Reich's motion"), pursuant to Fed.R.Civ.P. 12(b)(2)

("Rule 12(b)(2)"), on the ground that this Court lacks personal jurisdiction over Reich. (ECF No. 115.) On the same day, defendant Brown also filed a Motion to Dismiss Pursuant to Rule 12(b)(2), on the ground that this Court lacks personal jurisdiction over Brown ("Brown's motion"). (ECF No. 116.) Plaintiff then filed a Corrected Response in Opposition to both Reich's and Brown's motions ("the response"). (ECF No. 139.) Reich has filed a reply (ECF No. 146), but Brown has not.[1]

## I. Legal Standard

When an evidentiary hearing has not been held, a "plaintiff must only make a prima facie showing of personal jurisdiction." *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007). In that regard, all allegations in a complaint uncontradicted by a defendant's affidavits are accepted as true, and all factual disputes are resolved in the plaintiff's favor. The burden of proving jurisdiction is on the plaintiff. *Id*.

## II. Preliminary Matter

Before the Court begins with the relevant jurisdictional facts, the Court addresses a matter that has some impact on the facts that will be considered for this purpose. Notably, the affidavits

---

[1] As an initial matter, the Court notes its extreme frustration with the parties' tactics with respect to the number of pages in the instant pleadings. The most egregious example comes from plaintiff. On October 13, 2017, plaintiff moved to file a combined response of no more than 35 pages (ECF No. 134), which the Court granted (ECF No. 137). Plaintiff filed a 35-page response, only, in doing so, plaintiff incorporated by reference the entirety of its previously filed 40-page response to prior motions to dismiss. (*See generally* ECF No. 139.) In other words, plaintiff effectively filed a 75-page response, not a 35-page one. This is not what the Court granted plaintiff leave to do. Moreover, and perhaps understandably, in reply, Reich also proceeded to incorporate by reference a prior reply (*see* ECF No. 146 at 2), which, again, resulted in an increase to the allowed page limits. Ordinarily, the Court should strike both pleadings, but, on this occasion only, the Court will consider the same. **Counsel for all parties, though, are forewarned that no further kindness in this respect, or with respect to any other violation of the Court's Civil Practice Standards, such as those for summary-judgment papers, will be shown, and any offending pleading will not be considered by the Court.**

submitted by Reich. To cut short a story that is longer than it should be, it appears that Reich has, at the very least, some trouble with recalling the truth. For example, in the first iteration of an affidavit Reich submitted with a prior motion to dismiss (ECF No. 11-3), Reich stated that he had never been employed by VTS and had never been an officer or director of VTS (*id*. at ¶¶ 15-16). In subsequent versions of Reich's affidavit, those unequivocal statements were replaced with statements that Reich was never a *paid* employee of VTS and he did not *believe* that he acted with the authority of an officer or director for VTS. (*See* ECF No. 118-1 at ¶¶ 17, 29.) More recently, Reich has been forced to amend his affidavit again, this time to correct or clarify statements previously made about never signing checks for VTS and never manually entering credit transactions for VTS. (*See* ECF No. 157-1.) In light of Reich's deposition testimony (ECF No. 162-1), which resulted in the need to amend the affidavit, there may be further need to finesse Reich's statements.

Put simply, the Court does not credit the statements in Reich's most recent affidavits that have been changed from previous versions of those statements. Factors to consider in this regard are whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to pertinent evidence at the time, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). First, because this matter involves conflicting affidavits, whether Reich was previously cross-examined does not apply. Nonetheless, the purpose of that factor—that an affiant have an opportunity to clarify his deposition testimony—clearly weighs against Reich given that he had sole power and control over the words he used in his affidavits. Second, because the statements at issue involve Reich's conduct or role at VTS, he obviously had access to the pertinent information. Third, although Reich attempts to explain in his amendment that he could not recall certain facts (*see* ECF

3

No. 157-1), the statements at issue in Reich's prior affidavits, unlike others, are unequivocal, using the word "never" to characterize Reich's conduct or role.

The Court also does not credit Reich's statements that he cannot recall certain events or matters. In particular, the Court will not consider as disputing plaintiff's allegations Reich's statements that he cannot recall ever having heard of plaintiff or that plaintiff was processing VTS' credit card transactions. (*See* ECF No. 118-1 at ¶¶ 18-19.) Put simply, the failure to recall something does not contradict plaintiff's allegations. As a result, the Court will consider plaintiff's allegations as true with respect to those matters. *See Melea*, 511 F.3d at 1065.

That being said, not all of the statements in the affidavit Reich submitted with the instant motion to dismiss (ECF No. 118-1) ("the Reich affidavit") involve corrections of prior statements or non-contradictions. Most pertinently, the Court refers to Reich's statements that he was not aware of the existence or content of the application VTS submitted to plaintiff, the existence or content of any agreements between VTS and plaintiff, the location of plaintiff, and the location where VTS' credit card transactions would be processed. (*Id.* at ¶¶ 20-23.) Contrary to plaintiff's assertion, those statements are not vague or equivocal (*see* ECF No. 74 at 26-27), at least not in the manner that the Court reads the same, which is that Reich is stating that he has no knowledge of the relevant matters. *See* New Oxford American Dictionary 1878 (3d ed. 2010) (defining "unaware" as "having no knowledge of a situation or fact"). Whether plaintiff has presented conflicting evidence of Reich's knowledge on these matters will be discussed *supra*, but the statements will not be excluded merely because they exist in a document containing other statements that are sham or non-contradictory.

### III. Relevant Jurisdictional Facts

Plaintiff is a Delaware limited liability company with its principal place of business in Broomfield, Colorado. (ECF No. 102 at ¶ 1.) Brown is a resident of Louisiana. (*Id*. at ¶ 2.) Reich is a resident of New York, and owns, *inter alia*, a New York property located at 5 Lemberg Court. (*Id*. at ¶ 4.) Reich operates D&R Toners, Inc. ("D&R") and NY Toner & Supplies, Inc. (*Id*.) BA is an Illinois limited liability company organized by Appelhans. (*Id*. at ¶ 6.) VTS was organized in three states: in Illinois by Reich and Grek; in New York by Reich; and in California by Appelhans and Michael Mathison. (*Id*. at ¶ 7.) The version of VTS organized in New York was listed as conducting business at a residence titled in Reich. (*Id*. at ¶ 7(B).)

VTS purported to sell toner cartridges and related products throughout the United States. (*Id*. at ¶ 16.) Brown was the Chief Financial Officer, bookkeeper, and registered agent of VTS. (ECF No. 62-1 at ¶ 16.) Reich was the Chief Executive Officer/manager of VTS. (ECF No. 102 at ¶ 9; ECF No. 74-14 at 3.)

Plaintiff is in the business of processing and settling card transactions on behalf of merchants. (ECF No. 102 at ¶ 13.) In performing these functions, plaintiff receives and captures card transactions initiated by merchants, routes them to the appropriate card issuing bank, settles the transactions, collects the resulting credits, and then forwards the credit to the merchant's account. (*Id*.) Regulations issued by the card networks, such as VISA and MasterCard, provide that a card holder is entitled under certain circumstances to charge back a transaction between the card holder and a merchant. (*Id*. at ¶ 14.) Such charge-back rights may be exercised up to 180 days after the date of the card transaction. As the processor of a transaction that has been charged back, plaintiff

is required to re-credit the issuing bank for the card holder's account, and must look to the merchant to recover the re-credited amount. (*Id*.)

In November 2013, Brown submitted an Application for Merchant Card Processing ("the application") to plaintiff at its offices in Colorado, naming VTS as the prospective merchant. (ECF No. 102 at ¶ 22.) The application stated that plaintiff was located in Broomfield, Colorado. (*Id*.) By signing the application, Brown affirmed its accuracy and completeness, and acknowledged that he had read and agreed to the Merchant Card Processing Agreement ("the MCPA"). (ECF No. 74-2 at 6.) The MCPA provided that plaintiff's offer to enter into the same was made in Colorado, it was to be performed in Colorado, it was governed by Colorado law, and it was subject to arbitration, or the jurisdiction of courts, in Colorado. (ECF No. 74-3 at ¶¶ 19, 20.2.) Pursuant to the MCPA, VTS was required to reimburse plaintiff for any charge back, and granted plaintiff a security interest in each card transaction and its proceeds. (*Id*. at ¶¶ 14.1(a), 15.)

Plaintiff accepted and approved the application. (*Id*. at ¶ 27.) In December 2013, plaintiff began processing card transactions, and settled the resulting proceeds to an account in VTS' name that was controlled by Grek, Appelhans, and Reich ("the account").[2] (*Id*. at ¶ 28.) Brown had access to and monitored the account on a near daily basis, and initiated and/or ordered payments and transfers from the account. (*Id*.) From December 2013 to August 2016, plaintiff mailed monthly statements to Grek. (*Id*. at ¶ 29.) Brown requested additional hard copy statements from plaintiff. All of the statements showed plaintiff's address in Broomfield, Colorado. (*Id*.)

_____

[2] In the Reich affidavit, Reich states that he did not have control over VTS' equipment and software. (ECF No. 118-1 at ¶ 26.) The Court does not consider this ambiguous reference to equipment and software as contradicting plaintiff's specific allegation that Reich had control over the account.

From December 2013 to July 2015, VTS initiated and presented a total of 1,490 card transactions to plaintiff, totaling more than $15 million. (*Id*. at ¶ 30.) Each of these transactions was manually entered at a computer terminal by Brown, Appelhans, Grek, or Reich, or a person, most often Brigitte Weber ("Weber"), who was granted access to the terminal by them and acting at their direction. (*Id*. at ¶ 31; ECF No. 162-1 at 47:16-50:18.) Within one or two days after plaintiff began processing card transactions, Reich presented plaintiff with a charge on his personal card in the amount of $20,000. (*Id*. at ¶ 32.) One of plaintiff's employees advised Reich and Weber that personal charges were not permitted. Reich referred the employee to Brown, who emailed a purported invoice to the employee representing that the charge was for inventory. In reliance on the invoice, plaintiff allowed the transaction to be processed. Reich subsequently initiated and presented additional personal card transactions to plaintiff through VTS, each referencing or accompanied by a fabricated invoice.[3] One of those charges, in the amount of $24,600, was charged back and forms part of plaintiff's loss. (*Id*.) Thereafter, Appelhans, Brown, Reich, and Grek agreed that all card transactions presented to plaintiff for the purpose of producing cash deposits would be accompanied by an invoice number so as to disguise the transaction as a product sale. (*Id*. at ¶ 33.)

Plaintiff's personnel in Colorado received multiple communications (at least nine) from Brown by email and telephone. (*Id*. at ¶ 34.) In at least four of those communications, Brown supplied plaintiff with fabricated invoices used to disguise card transactions. Occasional

---

[3] As discussed *supra*, the Court does not credit Reich's statement that he never manually entered VTS credit transactions or "otherwise submitted for settlement" VTS credit transactions (*see* ECF No. 118-1 at 25), not least because Reich's deposition testimony does not support this statement. That testimony reflects that Reich directed Weber to enter or submit credit transactions to plaintiff. (*See* ECF No. 162-1 at 47:16-50:18.) If that is not "otherwise" submitting a credit transaction, the Court does not know what is.

communications were also received from Reich, or a person, normally Weber, calling on his behalf. (*Id*.)

In late 2015, volume and average ticket amount of card transactions began to increase. (*Id*. at ¶ 35.) By February 2016, volume exceeded $750,000. At this time, Brown contacted plaintiff to request that the merchant address for VTS be changed to a P.O. box. Brown requested this change because he, Grek, Appelhans, and Reich had determined to discontinue or phase out legitimate business activity by VTS, and to use VTS' access to plaintiff's card processing as a vehicle for the presentation and settlement of card transactions designed solely to produce cash deposits to the account. (*Id*.)[4]

Beginning in February 2016 and continuing into early July 2016, 251 card transactions, totaling approximately $5.4 million ("the Subject Transactions"), were submitted by defendants for processing and settlement by plaintiff. (*Id*. at ¶ 36.) These transactions were settled by plaintiff through deposit of the proceeds to the account. (*Id*.)

On August 1, 2016, defendants abruptly announced that VTS had discontinued operation by posting a notice on VTS' website. (*Id*. at ¶ 39.) None of the defendants contacted plaintiff about VTS' cessation of operations. (*Id*.) On August 11, 2016, plaintiff began to receive charge backs related to the Subject Transactions. (*Id*. at ¶ 40.) As of the date of the SAC, plaintiff has received approximately $1.831 million in charge backs ("the Charge Back Transactions"). (*Id*.) Each Charge Back Transaction was (a) initiated and presented to plaintiff as a transaction for the purchase of goods sold by VTS for immediate delivery and referencing a purported invoice by number, (b) not

---

[4] To the extent Reich's statement that he was not involved in the daily business operations of VTS (*see* ECF No. 118-1 at ¶ 30) is meant to contradict this allegation, the Court rejects any such contention. Reich's statement is simply too imprecise to contradict the specific allegation made against him in the SAC in this regard.

for the sale of any goods or merchandise, but solely to produce cash deposits to the account, and (c) designed and intended to be charged back by the card holder, but only after plaintiff had processed the transaction and forwarded the related proceeds to the account. (*Id*. at ¶ 41.) The proceeds were then removed from the account by Grek, Appelhans, and Reich, and diverted and used for personal and other purposes. (*Id*.) The Charge Back Transactions were accompanied by correspondence, purportedly from the card holders, claiming that the subject goods had not been delivered as promised. (*Id*. at ¶ 43.) This correspondence was written by the same person, containing identical language and grammatical errors. (*Id*.) Sixty percent of the Charge Back Transactions are comprised of large, and in many cases even dollar, transactions initiated by Reich, his wife, and persons located or having property within a one mile radius of the 5 Lemberg Court address used by Reich and Grek. (*Id*. at ¶ 44.)

Plaintiff learned of VTS' cessation of operations on August 11, 2016. (*Id*. at ¶ 47.) By that time, all proceeds related to the Subject Transactions had been removed from the account. All attempts by plaintiff to recover proceeds related to the Charge Back Transactions by debiting the account have been dishonored for insufficient funds. As a result, not a single Charge Back Transaction has been reimbursed, and plaintiff has incurred losses of more than $1.831 million. All such losses have occurred in Colorado. (*Id*.)

From and after 2012, hundreds of fund transfers, totaling millions, were made without supporting documentation between and among accounts in the name of VTS, BA (which were controlled by Appelhans), and D&R (which were controlled by Reich). (ECF No. 102 at ¶ 10(A).) From 2012, credit cards held by Reich and Grek personally were used to pay expenses purportedly incurred by or for VTS in California, Illinois, New York, and elsewhere. (*Id*. at ¶ 10(B).) In 2012

and thereafter, card transactions purportedly representing VTS sales were processed and settled by Reich under the name of D&R. (*Id*. at ¶ 10(C).)  In 2013 and 2014, D&R was used as a front and substitute for VTS in efforts to continue business with the State of California. (*Id*. at ¶ 10(D).)

From January 2016 to August 2016, approximately $6,924,385 was credited to the account. (*Id*. at ¶ 49.)  Of that amount, approximately $5,269,733 was transferred to or for the benefit of BA. Over $810,000 was transferred to or for the benefit of Appelhans, his wife, Grek and members of his family, Reich, his wife, and others associated with Grek, Reich, and Appelhans. (*Id*.)  Over $121,000 was paid from an account held in the name of BA to or for the benefit of Brown. (*Id*. at ¶ 50.)

## IV.    Discussion

In order for this Court to assert personal jurisdiction over defendants, they must have certain minimum contacts with the State of Colorado. *Melea*, 511 F.3d at 1065.  Minimum contacts can be achieved in one of two ways: specifically or generally. *See id*. at 1065-66.  The Court addresses specific personal jurisdiction in this Opinion because plaintiff does not rely upon general personal jurisdiction.[5]  (*See generally* ECF No. 139.)  The Court also addresses each motion to dismiss separately.

### A.    Specific Personal Jurisdiction

A court may exercise specific personal jurisdiction over a defendant consistent with the Due Process Clause if a plaintiff shows that "(1) the defendant has purposefully availed itself of the privilege of conducting activities or consummating a transaction in the forum state, and (2) the

---

[5] Because Colorado's long-arm statute confers the maximum jurisdiction permissible under the Due Process Clause, *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008), this Court turns straight to the constitutional analysis.

litigation results from alleged injuries that arise out of or relate to those activities." *Emp'rs Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1160 (10th Cir. 2010) (quotations, internal quotation, and citations omitted). Purposeful availment, however, does not mean the same thing with respect to all claims. For tort claims it requires "(a) an intentional action that was (b) expressly aimed at the forum state with (c) knowledge that the brunt of the injury would be felt in the forum state." *Newsome v. Gallacher*, 722 F.3d 1257, 1264-65 (10th Cir. 2013) (ellipses and quotation omitted). Whereas, "[i]n order to assess whether minimum contacts occurred in a contract case, we look at prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *AST Sports Sci., Inc. v. CLF Distribution Ltd.*, 514 F.3d 1054, 1058 (10th Cir. 2008) (quotation omitted).

### 1. Brown

Brown argues that the SAC contains no allegations that the "focal point" of his alleged torts, or of plaintiff's alleged injuries, occurred in Colorado. (ECF No. 116 at 9.) Brown argues that he is only alleged to have submitted an application to plaintiff and communicated with plaintiff, and it is insufficient that plaintiff included a Colorado address in its contract with VTS. (*Id*. at 8.) Brown further argues that plaintiff has its executive offices and corporate headquarters in New York, and operations in three different states. (*Id*. at 9.) Brown also argues that plaintiff does not allege that it was injured by alleged misrepresentations in the application, but by charge back transactions initiated by individual card holders. (*Id*.)

Because Brown focuses his arguments upon the purposeful availment test for tort claims (*see* ECF No. 116 at 8-9), the Court does so too here. First, plaintiff has alleged an intentional action or actions on Brown's part, and Brown does not contend otherwise. Notably, Brown's intentional acts

of supplying plaintiff's personnel with fabricated invoices used to disguise card transactions and manually entering card transactions, including the Subject Transactions and Charge Back Transactions. (*See* ECF No. 102 at ¶¶ 31, 33-34.)

Second, Brown's arguments focus upon the second part of the relevant test: whether he expressly aimed his acts at the forum state. The Tenth Circuit has explained that this part of the analysis looks to the "defendant's intentions—where was the 'focal point' of its purposive efforts." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1075 (10th Cir. 2008).

In *Dudnikov*, the plaintiffs used eBay (an internet auction site) to sell certain images. 514 F.3d at 1067. Upon seeing plaintiffs' images on eBay, the defendants believed that the images infringed their copyrights, and, after contacting eBay, successfully suspended the plaintiffs' auction of the images, which allegedly had adverse consequences for the plaintiffs' business and future dealings with eBay. *Id*. The Tenth Circuit concluded that the exercise of specific personal jurisdiction was appropriate because the defendants' conduct, in seeking suspension of the plaintiffs' auction, resulted in the intentional cancellation of a Colorado auction and an effect on the plaintiff's Colorado business operations. *Id*. at 1075-76. The Tenth Circuit observed that the defendants' "express aim in acting" was to halt a Colorado-based sale by a Colorado resident. *Id*. at 1076.

Here, arguably, there are multiple alleged aims of Brown's conduct. One aim was allegedly to dupe plaintiff's Colorado employees into processing and settling credit card transactions. (*See* ECF No. 102 at ¶¶ 28, 32-33.) There could be another express aim of Brown's conduct: to produce cash deposits in a Bank of America account held in VTS' name. (*See id*.) The problem with this latter aim, at least from plaintiff's perspective, is that there is no allegation as to where the Bank of America account was or is located. Nonetheless, the Court finds that, for present purposes, Brown's

express aim in acting was to cause plaintiff's Colorado employees to process and settle credit card transactions. As plaintiff argued in its earlier response (ECF No. 74), plaintiff would not have processed the credit card transactions or settled proceeds therefrom to the account, and thus, no proceeds would have been available to remove, without Brown (and other defendants) presenting allegedly fraudulent credit card transactions to plaintiff in Colorado and submitting allegedly fabricated invoices to plaintiff in Colorado (*id*. at 21; ECF No. 102 at ¶¶ 30-33, 41).

Third, plaintiffs have alleged that Brown knew the brunt of plaintiff's injury would be felt in Colorado. As an initial matter, contrary to Brown contention (*see* ECF No. 116 at 9), the brunt of plaintiff's injury is clearly alleged to have taken place in Colorado (*see* ECF No. 102 at ¶ 47 ("All such losses and related injuries have occurred and been suffered in Colorado.")). The mere fact that Brown has found plaintiff's website, which indicates that plaintiff's executive offices, corporate headquarters, and other operations are located outside Colorado, does not contradict the specific allegation in the SAC that all losses were suffered in Colorado.

The next question is whether Brown *knew* the brunt of plaintiff's injury would be felt in Colorado. As far as the Court can discern, in his affidavit, Brown does not contradict plaintiff's allegations that Brown knew plaintiff was located in Colorado and knew that plaintiff's processing and settling of credit card transactions would be done in Colorado. (*See generally* ECF No. 62-1; *see* ECF No. 102 at ¶ 23.) Even if Brown were to have contradicted these allegations, the Court would find that there are sufficient record facts to support them. Notably, the application, which Brown signed, acknowledging that he had read the same and the MCPA, clearly discloses plaintiff's Broomfield, Colorado address. Moreover, the MCPA specifically states that the MCPA will be

performed in Colorado and is subject to Colorado law. On these facts, the Court has little problem in finding that Brown knew the brunt of plaintiff's injury would be felt in Colorado.

In this light, the Court finds that plaintiff's have sufficiently alleged that Brown purposefully availed himself of Colorado for purposes of plaintiff's tort claims. The next question is whether this litigation results from alleged injuries that arise out of or relate to Brown's activities. *See Emp'rs Mut. Cas. Co.*, 618 F.3d at 1160. Here, plaintiff's alleged injury is $1.831 million in losses incurred due to plaintiff's inability to debit or otherwise charge the account for the Charge Back Transactions. (ECF No. 102 at ¶ 47.) Brown argues that plaintiff was not damaged by his alleged activities, but, instead, by charge back transactions that were initiated by individual card holders. (ECF No. 116 at 9.)

The Tenth Circuit has not yet announced what test to use when determining whether an injury arises out of or relates to a defendant's forum activities. *See Newsome*, 722 F.3d at 1270. The more restrictive of the tests is that a defendant's activities must be the proximate cause of the plaintiff's injury. *Id*. This test requires a court to "examine whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Id*. (citation and quotation omitted). The Court finds that plaintiff has satisfied this test. Here, plaintiff's tort claims revolve around allegedly fraudulent conduct in defendants' submission of credit card transactions for processing and settling by plaintiff. (*See* ECF No. 102 at ¶ 41.) Specifically, plaintiff alleges that each Charge Back Transaction that was submitted referenced a fabricated invoice number for the sale of goods, but each transaction was not for the sale of goods. (*Id*.) Brown's forum-based conduct, in manually entering, or directing others to manually enter, allegedly fraudulent credit card transactions, including each Charge Back Transaction, is, thus, directly relevant to whether Brown engaged in fraud. Merely

because individual card holders initiated charge backs does not mean that Brown's allegedly fraudulent conduct is not relevant to plaintiff's fraud-based tort claims. In fact, it is the essence of those claims. (*See id*. at ¶¶ 31, 33, 41.) As a result, the Court finds that plaintiff has sufficiently alleged injury arising out of or relating to Brown's activities.

This leaves a final jurisdictional question: whether the exercise of personal jurisdiction over Brown would "'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co.*, 326 U.S. at 316). The following factors are relevant to this question: (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effectual relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental social policies. *Dudnikov*, 514 F.3d at 1080. However, a defendant that "purposefully directed [his] activities at the forum state, can defeat personal jurisdiction only by presenting a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Niemi v. Lasshofer*, 770 F.3d 1331, 1350 (10th Cir. 2014) (quotations, citations, and alterations omitted).

Here, the only consideration Brown has brought to the Court's attention is the "substantial" burden traveling to Colorado would place on Brown given that he is in Louisiana. (ECF No. 116 at 10.) This unsubstantiated assertion of a substantial burden is not compelling. Notably, there is no statement in Brown's affidavit (ECF No. 62-1) as to the burden that will be placed upon him in traveling to Denver, let alone why any such burden should be considered substantial. In light of this failure to substantiate Brown's assertion, the Court cannot find that any burden on Brown traveling to Colorado is undue, especially in light of Colorado's interest in determining whether its businesses

of have been the victim of fraud and plaintiff's interest in receiving convenient relief in Colorado, its principal place of business.  *See Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cnty.*, 480 U.S. 102, 114, 107 S.Ct. 1026 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.").

### 2.    *Reich*

First, plaintiff has alleged that Reich engaged in intentional action.  Specifically, manually entering, or directing others to manual enter, fraudulent credit card transactions to plaintiff for processing and settling, including a transaction, in the amount of $24,600, that forms part of plaintiff's loss.  (ECF No. 102 at ¶¶ 31-32.)

Second, for the same reasons discussed *supra* with respect to Brown, the Court finds that the focal point of Reich's purposive efforts were in Colorado.  Notably, the express aim of Reich was the same express aim of Brown: to cause plaintiff's Colorado employees to process and settle allegedly fraudulent credit card transactions.

Third, as discussed *supra*, plaintiff's have clearly alleged that the brunt of its injury was felt in Colorado.  The important question in this regard, however, is whether Reich *knew* that the brunt of plaintiff's injury would be in Colorado.  On this occasion, the Court does not find that plaintiff's allegations are sufficient, at least not in light of Reich's affidavit statements that he did not know that plaintiff was located in Colorado.  To support its argument that Reich knew of plaintiff's location, plaintiff asserts that Reich, as an officer of VTS, is charged with knowing facts "critical to a business's core operations or to an important transaction that would affect a company's performance." (ECF No. 74 at 18 (quotation and citation omitted)).  Taking that assertion as fact,

the Court still does not see why *plaintiff's location* should be considered a fact critical to VTS' core operations or important to a transaction affecting VTS' performance. None of the cases plaintiff cites suggest otherwise. (*See* ECF No. 74 at 18, 26; ECF No. 139 at 21-22.) Plaintiff cites no case holding that an officer is charged with knowledge of every single term of an agreement or with knowledge of the place disclosed in an agreement as the location of the other party. And that is precisely what plaintiff asks this Court to find Reich was aware of due to his position at VTS. Thus, even if the Court was prepared to find Reich knew of the existence of the application, the MCPA, and even plaintiff, there are simply no allegations from which it can be inferred that he knew of *plaintiff's location*.

Plaintiff contends otherwise, but, the facts upon which it relies for inferential knowledge cast no light on the same. For example, plaintiff asserts that Reich was continuously involved in every detail of VTS, Reich was a party to VTS' relationship with its previous card processor, Reich was sophisticated in card processing, Reich initiated numerous card charges through VTS and communicated with plaintiff's personnel, Reich was in near daily communication with Brown and Weber who dealt directly with plaintiff, Reich coordinated and tracked card charges, and Reich and his wife received over $1 million in transfers related to card charges. (ECF No. 139 at 20-21.) The Court cannot discern how any of those alleged facts, collectively or individually, are relevant to Reich's knowledge of plaintiff's location. Merely because Reich might have been involved in every detail of VTS does not mean he knew plaintiff's location. The same is true of Reich receiving over $1 million from cards processed by plaintiff. Reich's involvement with the previous card processor is irrelevant to his knowledge of plaintiff's location, as is Reich's proficiency in card processing. Arguably, Reich's conversations with Brown and Weber may have given him the opportunity to

learn of plaintiff's location, but there is no allegation as to what matters were discussed. Conceivably, Reich may have also learned plaintiff's location through communicating with plaintiff, but, again, there is no allegation that such a matter ever came to light during these communications.

As a result, the Court cannot find that Reich knew that the brunt of plaintiff's injury would be felt in Colorado.

### B.    Alter Ego

Plaintiff's cupboard is not left bare, however, by the foregoing deficiency. Plaintiff argues that, because it is undisputed that this Court has jurisdiction over VTS, the Court also has jurisdiction over VTS' managers and members because VTS was an "alter ego" of its managers and members. (ECF No. 74 at 28-29.) Because Reich does not contend that an alter ego theory may not be used to exercise jurisdiction over him, and does not meaningfully contend that VTS is not subject to this Court's personal jurisdiction,[6] the Court will address whether VTS was Reich's alter ego.

In Colorado, personal jurisdiction may be exercised on a theory of alter ego. *See Griffith v. SSC Pueblo Belmont Operating Co. LLC*, 381 P.3d 308, 312 (Colo. 2016). The first part of this analysis requires a court to consider whether to pierce the corporate veil so as to impose liability on an LLC's members. *Id*. A court may pierce the corporate veil when "(1) the entity is merely the alter ego of the member, (2) the LLC form is used to perpetuate a wrong, and (3) disregarding the legal entity would achieve an equitable result." *Id*. at 313 (quotation and citation omitted). Factors to be considered when determining whether an entity is merely the alter ego of a member include:

---

[6] In a reply to a previous motion to dismiss (ECF No. 78), Reich asserted that he did not concede that VTS was subject to personal jurisdiction in Colorado (*id*. at 11). That was the extent of Reich's argumentation in this regard. (*See id*.) As far as the Court can discern, Reich has not raised the matter again, except by incorporating by reference its previous reply. (*See* ECF No. 115 at 11-12; ECF No. 146 at 13-14.) As a result, the Court finds that Reich has waived any argument that VTS is not subject to this Court's personal jurisdiction.

> whether (1) the [LLC] is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate … records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the [LLC] is used as a mere shell, (7) [members] disregard legal formalities, and (8) … funds or assets are used for noncorporate purposes."

*Stockdale v. Ellsworth*, 407 P.3d 571, 576-577 (Colo. 2017) (quotation, internal quotation, and citation omitted).

Here, plaintiff has sufficiently alleged that VTS was operated as Reich's alter ego. The Court finds the following allegations particularly relevant. VTS was organized in three separate jurisdictions, including by Reich in New York, and operated out of a residence titled in Reich's name. (ECF No. 102 at ¶ 7(B).) From and after 2012, hundreds of fund transfers, totaling millions, were made without supporting documentation between and among accounts in the name of VTS, BA (which were controlled by Appelhans), and D&R (which were controlled by Reich). (*Id*. at ¶ 10(A).) From 2012, credit cards held by Reich and Grek personally were used to pay expenses purportedly incurred by or for VTS in California, Illinois, New York, and elsewhere. (*Id*. at ¶ 10(B).) In 2012 and thereafter, card transactions purportedly representing VTS sales were processed and settled by Reich under the name of D&R. (*Id*. at ¶ 10(C).) In 2013 and 2014, D&R was used as a front and substitute for VTS in efforts to continue business with the State of California. (*Id*. at ¶ 10(D).) From January 2016 to August 2016, approximately $6,924,385 was credited to the account. (*Id*. at ¶ 49.) Of that amount, approximately $5,269,733 was transferred to or for the benefit of BA. Over $810,000 was transferred to or for the benefit of Appelhans, his wife, Grek and members of his family, Reich, his wife, and others associated with Grek, Reich, and Appelhans. Approximately $13,500 was expended from the account to purchase toner products on two occasions in April and

May 2016. (*Id*.) Over $121,000 was paid from an account held in the name of BA to or for the benefit of Brown. (*Id*. at ¶ 50.)

In light of these allegations and others, plaintiff has established the following. That VTS was not operated as a distinct legal entity. Notably, although VTS allegedly sold toner cartridges, and was credited with nearly $7 million between January and August 2016, during the same time period, VTS only spent $13,500 to purchase toner products. In addition, numerous card holders who allegedly paid for toner products from VTS have been unable to produce a record of having purchased the same (ECF No. 102 at ¶¶ 42-45), and each credit card transaction was designed to produce cash deposits in the account for personal and other purposes (*id*. at ¶ 41).

That funds and assets were commingled, adequate records were not kept, legal formalities were ignored, and funds and assets were used for noncorporate purposes. Notably, hundreds of fund transfers, totaling millions, were made without supporting documentation between and among accounts in the name of VTS, BA, and D&R. From 2012, credit cards held by Reich and Grek personally were used to pay expenses purportedly incurred by or for VTS. In 2012 and thereafter, card transactions purportedly representing VTS sales were processed and settled by Reich under the name of D&R. Then, in 2016, approximately $5,269,733 was transferred from the account to or for the benefit of BA, and over $810,000 was transferred to or for the benefit of Appelhans, his wife, Grek and members of his family, Reich, his wife, and others associated with Grek, Reich, and Appelhans.

That the nature of VTS' ownership and control facilitated misuse. Notably, VTS was organized in three separate jurisdictions, including by Reich in New York, operating out of a residence titled in Reich's name. In addition, Appelhans, Brown, Reich, and Grek agreed amongst

themselves that all credit card transactions submitted to plaintiff would be accompanied by a fabricated invoice number, and then all such submitted transactions referenced an invoice number. (ECF No. 102 at ¶¶ 33, 41.) Appelhans, Grek, Reich, and Brown also agreed to phase out legitimate business activity by VTS, and use VTS to submit fraudulent credit card transactions. (*Id*. at ¶ 35.)

That VTS was thinly capitalized. Notably, although nearly $7 million was credited to the account between January and August 2016, by August 11, 2016, all proceeds relating to the Subject Transactions had been removed from the account and all attempts by plaintiff to recover proceeds related to the Charge Back Transactions were dishonored for insufficient funds. (ECF No. 102 at ¶ 47.) The reason for VTS' insufficient funds was Reich, Appelhans, and Grek removing funds from the account and reducing its balance to at or near zero. (*Id*. at ¶¶ 34, 41.)

As a result, the Court finds that, for present purposes, VTS was the alter ego of Reich.[7] The Court further finds that VTS was used to perpetuate a wrong. Namely, VTS was allegedly used to submit fraudulent credit card transactions to plaintiff for the purpose of obtaining cash deposits in the account that defendants, such as Reich, could use for their own personal enrichment. Finally, the Court finds disregarding VTS' legal entity would achieve an equitable result. Notably, it is

---

[7] It could also be said that VTS was the alter ego of Appelhans, Grek, and Brown, but, given that those questions need not be resolved at this juncture, the Court limits its holding to Reich.

[8] Reich also does not meaningfully contest otherwise. In Reich's motion, he dedicated one paragraph to this matter, arguing only that plaintiff's allegations are conclusory. (*See* ECF No. 115 at 12.) They are not. In his most recent reply, Reich did not focus upon this matter at all. (*See* ECF No. 146 at 13-14.) Only in a previous reply did Reich more fully address this matter. (*See* ECF No. 78 at 11-12.) But, Reich's arguments miss the mark. Plaintiff has alleged that Reich used VTS for his own affairs, such as siphoning money from the account for his own personal use. Reich's affidavit statements about not believing he acted with the authority of an officer and not signing checks have not been considered. As for Reich's statement that he did not participate in VTS' daily business operations, the Court simply does not find that this very general statement contradicts the specific allegations in the SAC about Reich's involvement in the operations of VTS, such as agreeing with the other defendants to submit fabricated invoices with credit card transactions.

alleged that plaintiff has been unable to recover proceeds related to the Charge Back Transactions from the account, and Reich, *inter alia*, pocketed over $810,000 from the account.

As a result, VTS' contacts with Colorado may be imputed to Reich. *See Griffith*, 381 P.3d at 312. The next inquiry is whether the contacts imputed to Reich and Reich's own are enough to support specific personal jurisdiction. *See id*. As noted *supra*, Reich has waived any argument that VTS' is not subject to personal jurisdiction in Colorado. Nonetheless, even if Reich had not waived this argument, the Court would find that VTS' contacts with Colorado alone are enough to exercise specific personal jurisdiction over it.

Here, plaintiff raises a breach of contract claim against VTS. "In order to assess whether minimum contacts occurred in a contract case, we look at prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *AST Sports Sci.*, 514 F.3d at 1058.

First, prior negotiations. The record is somewhat disputed in this regard. In his affidavit, Brown stated that a representative, George Lopez ("Lopez"), from plaintiff contacted him over a three month period in 2013, attempting to solicit business. (ECF No. 62-1 at ¶ 17.) Brown recalled that Lopez worked out of California. (*Id*.) In a responsive affidavit, a supervisor at Lopez's office stated that plaintiff's records reflect that the initial communication between Lopez and Brown was on November 15, 2013, the date that the application was submitted. (ECF No. 74-22 at ¶ 3.) The supervisory employee stated that he could not rule out that Lopez contacted Brown prior to this, but, if there was such an earlier contact, it was unlikely to have been more than a week or two before November 15. (*Id*.) Despite plaintiff's attempts to clarify Brown's affidavit, there is still a lack of direct contradiction of the basic thrust of Brown's affidavit—that Brown was contacted by Lopez,

22

i.e., plaintiff contacted Brown, rather than the other way round. As such, the Court finds this factor weighs against a finding of purposeful availment.

Second, contemplated future consequences and the parties' actual course of dealing. Here, the contemplated consequences of plaintiff and VTS entering into the MCPA was for plaintiff to process and settle credit card transactions submitted by VTS. It is undisputed that plaintiff's processing and settling of the transactions was to take place in Colorado; the terms of the MCPA make this clear. This is consistent with the parties' actual course of dealing, as VTS did submit credit card transactions to plaintiff, and plaintiff processed and settled them at its location in Colorado. In addition, the MCPA states that its initial term would be for a period of three years, thus, contemplating an extended business relationship. As a result, both of these factors weigh in favor of exercising jurisdiction.

Finally, the terms of the MCPA. The terms of the MCPA reflect that VTS purposefully invoked the benefits and protections of Colorado law. Notably, the choice of law provision in the MCPA provides for Colorado law, as well as arbitration to be held in Colorado. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 481-482, 105 S.Ct. 2174 (1985) (explaining that a choice-of-law provision is relevant to a court's inquiry as to whether a defendant purposefully invoked the benefits and protections of a state's laws). In addition, the MCPA states that plaintiff's offer to enter into the MCPA was made in Colorado, and would be performed in Colorado. As a result, the Court finds that this factor weighs in favor of exercising jurisdiction.

In summary, although it appears that plaintiff reached out to VTS at some point prior to the execution of the MCPA, the parties contemplated future consequences in Colorado and acted consistent with the same. In addition, the terms of the MCPA reflect a purposeful invocation of

Colorado's benefits and protections. As a result, the Court finds that VTS has purposefully availed itself of Colorado for purposes of the breach-of-contract claim.

The next question is whether this litigation results from alleged injuries that arise out of or relate to VTS' activities. *Emp'rs Mut. Cas. Co.*, 618 F.3d at 1160. The Court finds that they do. As discussed *supra*, the most restrictive test in this regard asks "whether any of the defendant's contacts with the forum are relevant to the merits of the plaintiff's claim." *Newsome*, 722 F.3d at 1270 (citation and quotation omitted). Here, the terms of the MCPA and the parties' actual course of dealing are relevant to plaintiff's breach of contract claim. Notably, plaintiff's allege that VTS' course of dealing with plaintiff involved the submission of fraudulent credit card transactions, which, if true, violated the terms of the MCPA because the MCPA prohibits the submission of any transaction known to be fraudulent. (*See* ECF No. 74-3 at ¶ 3.3(a).) Moreover, the MCPA provides that VTS is obligated to reimburse plaintiff for any sums plaintiff pays in connection with a charge back. (*Id*. at ¶ 15.) Plaintiff alleges that VTS has failed to reimburse it, and this failure has led to a loss of $1.831 million. As a result, the Court finds that plaintiff's alleged injury arises out of or relates to VTS' activities.

The final jurisdictional question is whether the exercise of personal jurisdiction over Reich would "'offend traditional notions of fair play and substantial justice.'" *Dudnikov*, 514 F.3d at 1080 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

As discussed *supra*, the Court finds that plaintiff and Colorado have an interest in having this matter heard in this forum, given that Colorado has an interest in determining whether its businesses of have been the victim of fraud, and plaintiff has an interest in receiving convenient relief in Colorado, its principal place of business. The main factor Reich brings to the Court's attention is

the purported "physical and financial burden" in traveling to and staying in Colorado. (ECF No. 115 at 14.) As with Brown, though, Reich points to no specific hardships he will suffer from traveling to and from Colorado, nor does he explain how great the burden will be upon him. Instead, the most color Reich provides on the purported burden is that it would be "avoid[able]." (*Id*.) As such, Reich has failed to show that litigation in Colorado would be "'gravely difficult and inconvenient.'" *See Pro Axess, Inc. v. Orlux Distribution, Inc.*, 428 F.3d 1270, 1280 (10th Cir. 2005) (quoting *Burger King*, 471 U.S. at 478). As for Reich's other concern—that plaintiff's headquarters are in New York—this does not take away from the fact that plaintiff has alleged that its principal place of business is in Colorado, with 600 individuals employed in Broomfield and 110 individuals employed in Aurora. (*See* ECF No. 102 at ¶ 1.) Therefore, the location of plaintiff's headquarters in another state does not take away from Colorado's interest in determining whether plaintiff's forum-based business has been injured.

As a result, because the relevant factors weigh against Reich, and because "it is incumbent on defendants to present a compelling case that the presence of some other considerations would render jurisdiction unreasonable," *see Dudnikov*, 514 F.3d 1080 (quotation omitted), which Reich has not done, the Court finds that traditional notions of fair play and substantial justice would not be offended by exercising personal jurisdiction over Reich.

## V.     Conclusion

For the reasons discussed herein, the Court DENIES Reich's Motion to Dismiss Second Amended Complaint for Lack of Personal Jurisdiction (ECF No. 115), and DENIES Brown's Motion to Dismiss Pursuant to Rule 12(b)(2) (ECF No. 116).

**SO ORDERED.**

DATED this 13th day of February, 2018.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge